COMMONWEALTH of Pennsylvania,
Appellee,

v.

April Georgette SMITH, Appellant.

Superior Court of Pennsylvania.

Argued Aug. 5, 1998.
Filed April 26, 1999.
Reargument Denied June 30, 1999.

Jeffrey G. Velander, Stroudsburg, for appellant.

Adrienne Duvall, Asst. Dist. Atty., Norristown, for Commonwealth, appellee.

Before McEWEN, President Judge, and STEVENS and LALLY-GREEN, JJ.

STEVENS, J.:

¶ 1 This is an appeal from the judgment of sentence entered in the Court of Common Pleas of Montgomery County following Appellant's conviction of possession of a controlled substance,[1] possession of a controlled substance with the intent to deliver,[2] and possession of a small amount of marijuana.[3]

¶ 2 Appellant's conviction and sentence stem from a November 22, 1996 drug interdiction investigation performed at the bus terminal located in the Valley Forge Shopping Center in Montgomery County. N.T. 9/22/97 at 7. As part of the investigation, Agent Ronald Paret, of the Pennsylvania Attorney General's Office, and Trooper David Hodges, of the Pennsylvania State Police, approached a Greyhound bus which had stopped on its journey from New York City to Pittsburgh via the Philadelphia and Harrisburg areas. N.T. 9/22/97 at 8, 30. Agent Paret and Trooper Hodges were dressed in plain clothes, and wore jackets which identified them as law enforcement officers. N.T. 9/22/97 at 11-12. Both carried weapons concealed by their jackets. N.T. 9/22/97 at 12.

¶ 3 Agent Paret and Trooper Hodges received permission from the bus driver to board the bus, and, before entering the bus themselves, they first allowed passengers to board or exit it. N.T. 9/22/97 at 9-11, 25. When the law enforcement officers boarded the bus, Trooper Hodges identified himself and Agent Paret, and explained why they were on the bus. N.T. 9/22/97 at 12-13, 49. Starting at the back of the bus, Trooper Hodges began to talk to the passengers. N.T. 9/22/97 at 13, 51.

While the law enforcement officers were in the back of the bus, the aisle was clear for passenger movement, and the bus door remained open at all times. N.T. 9/22/97 at 13, 15. While conversing with the passengers, including Appellant, Agent Paret and Trooper Hodges used a normal tone of voice, and did not raise their voices. N.T. 9/22/97 at 15. When performing a drug interdiction investigation, the law enforcement officers abide by the schedule of the busses, and, if a driver indicates to Agent Paret that the bus needs to leave, Agent Paret "wraps up" the investigation. N.T. 9/22/97 at 43. In addition, if a passenger is unwilling to speak with him during an investigation, Trooper Hodges does not press that person but instead moves on to the next passenger. N.T. 9/22/97 at 58.

¶ 4 There were approximately thirty-five (35) to forty (40) people on the bus during the investigation in question, and Appellant, sitting in a window seat in the first row, opposite to the driver's side, was the last person Trooper Hodges approached. N.T. 9/22/97 at 15-16. The aisle seat next to Appellant was occupied. While talking with Appellant, Trooper Hodges stood in the stairwell of the bus, leaving the aisle in front of Appellant clear and the open bus door accessible, and Agent Paret stood in the aisle to the rear of the row which Appellant sat. N.T. 9/22/97 at 16, 32. If a passenger wished to enter or exit the bus at this point, they would have been able to pass next to Trooper Hodges, as he was not blocking the stairway. N.T. 9/22/97 at 32.

¶ 5 Trooper Hodges asked Appellant if he could see her ticket and some identification, and noted that both bore the name April Smith. N.T. 9/22/97 at 52-53. After examining Appellant's ticket and identification, Trooper Hodges handed them back to Appellant. N.T. 9/22/97 at 53. He then inquired about her trip, and Appellant indicated that she was travelling to Pitts-

1. 35 P.S. § 780-113(a)(16).

2. 35 P.S. § 780-113(a)(30).

3. 35 P.S. § 780-113(a)(31).

burgh, where she would be staying for five days. N.T. 9/22/97 at 53. Trooper Hodges realized that her ticket did not have a luggage claim ticket stapled to it, however, and when he asked if Appellant had any luggage, she responded that she did not. N.T. 9/22/97 at 53. Trooper Hodges found it unusual for a person to be taking a five-day trip with no luggage whatsoever. N.T. 9/22/97 at 53, 56. Despite Appellant's claim that she had no luggage, Trooper Hodges noticed a black handbag sitting on the floor of the bus, right next to Appellant's feet. N.T. 9/22/97 at 54; N.T. 9/23/97 at 52. The bag was positioned between Appellant's right foot and the wall of the bus, not between Appellant's left foot and the feet of the passenger sitting next to her. N.T. 9/22/97 at 18, 54. When Trooper Hodges asked Appellant "does that bag right by your foot belong to you," Appellant looked away from him and denied ownership. N.T. 9/22/97 at 56. Trooper Hodges asked the passenger sitting next to Appellant if the bag was hers, and when the passenger told him it was not, the trooper retrieved the bag. N.T. 9/22/97 at 17–18, 36, 56. In order to determine if the bag had been abandoned on the bus, Trooper Hodges held it up for the other passengers to see, and asked if it belonged to anyone. N.T. 9/22/97 at 17–18, 36, 56, 80. He repeated this process twice, but no one claimed the bag. N.T. 9/22/97 at 36, 56–57; N.T. 9/23/97 at 60. Before concluding that a bag has been abandoned, it was Agent Paret's practice to make sure that every passenger was accounted for, and that none were off the bus when the law enforcement officers sought the owner of a bag. N.T. 9/22/97 at 38–39. Trooper Hodges set the bag down on the stairwell, out of sight of the passengers, and looked inside, finding a shirt, and plastic bags containing zip-lock bags which held what appeared to be drugs.[4] N.T. 9/22/97 at 57–58, 85; N.T. 9/23/97 at 55. Trooper Hodges did not at this point feel he had probable cause to arrest Appellant,

but he did not believe her statement that the bag found directly at her feet, and unclaimed by any other passenger, was not hers. N.T. 9/22/97 at 60. He asked Appellant if she would mind speaking with him off the bus in private. N.T. 9/22/97 at 57, 59. Trooper Hodges did not touch Appellant in any way, or make any show of force when making this request. N.T. 9/22/97 at 61. When Appellant followed the trooper off the bus, he again asked if the bag was hers. N.T. 9/22/97 at 60, 62. She looked down, and again denied ownership. N.T. 9/22/97 at 60, 62. Trooper Hodges explained to Appellant that the police would be able to identify the owner of the bag through finger prints and hair samples. N.T. 9/22/97 at 60. Appellant was silent for a moment, then responded that the drugs did not belong to her and that she was only transporting them for someone else. N.T. 9/22/97 at 60. In light of this statement, Trooper Hodges took Appellant into the bus station, explained her *Miranda*[5] rights, and arrested her for transporting narcotics. N.T. 9/22/97 at 64–66. After her Miranda rights were given, Appellant told Trooper Hodges that she was transporting the drugs for a friend in exchange for four hundred dollars ($400.00) to buy her son shoes. N.T. 9/22/97 at 66; N.T. 9/23/97 at 56–58. A search of Appellant's purse revealed two small packs of marijuana.

¶ 6 On February 19, 1997, Appellant filed an omnibus pre-trial motion, seeking to suppress the evidence seized by the police, as well as the statements Appellant made to Trooper Hodges. A suppression hearing was held on September 22, 1997, and Appellant's motion was denied from the bench. Following a bench trial held the next day, which incorporated testimony taken at the suppression hearing, Appellant was found guilty of possession of a controlled substance, possession of a controlled substance with the intent to deliver,

---

4. Subsequent testing revealed that the zip-lock bags contained 496 grams of crack cocaine.

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

and possession of a small amount of marijuana. The Commonwealth filed notice that it sought imposition of the mandatory minimum sentence with regard to Appellant's conviction for possession with intent to deliver a controlled substance, and Appellant was sentenced on December 5, 1997, to the mandatory minimum sentence of four (4) to eight (8) years imprisonment.

¶ 7 On December 29, 1997, Appellant filed this timely appeal, raising the following issues for our review: (1) Whether the lower court erred in denying Appellant's motion to suppress the cocaine and marijuana; (2) Whether the lower court erred in denying Appellant's motion to suppress her statements; [6] and (3) Whether the lower court erred in sentencing Appellant to a mandatory minimum sentence.

¶ 8 Addressing the suppression issues first, the following standard of review has been enunciated:

When we review the ruling of a suppression court, we must determine whether its factual findings are supported by the record. Where the defendant challenges an adverse ruling of the suppression court, we will consider only the evidence for the prosecution and whatever evidence for the defense which is uncontradicted on the record as a whole; if there is support on the record, we are bound by the suppression court, and we may reverse that court only if the legal conclusions drawn from these facts are erroneous. Moreover, even if the suppression court did err in its conclusions, the reviewing court may nevertheless affirm its decision where there are other legitimate grounds for admissibility of the challenged evidence.

*Commonwealth v. Holt*, 711 A.2d 1011, 1014 (Pa.Super.1998) (citation omitted).

¶ 9 Pursuant to the standard of review enunciated in *Holt, supra,* we conclude that the suppression court's refusal to suppress the evidence or Appellant's statements is not erroneous in light of the evidence of record, viewed in a light most favorable to the Commonwealth as verdict winner.

¶ 10 Three types of police contact have been recognized by the courts of Pennsylvania:

The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*In the Interest of S.J.*, 551 Pa. 637, 713 A.2d 45, 47 n. 3 (1998) (citations omitted).

¶ 11 "With respect to police conduct that falls short of an investigative stop, the Supreme Court has made it clear that a 'seizure does not occur simply because a police officer approaches an individual and asks a few questions.'" *United States v. Kim*, 27 F.3d 947, 950 (3d Cir. 1994) (citing *Florida v. Bostick*, 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991)). "Absent some coercive conduct by police, a request for cooperation or consent to search does not automatically convert an undeniably permissible encounter into an illegal seizure ..." *Commonwealth v. Shelly*, 703 A.2d 499, 502 (Pa.Super.1997) (citation omitted).

¶ 12 This Court indicated in *In the Interest of Jermaine*, 399 Pa.Super. 503, 582 A.2d 1058 (1990), that the following factors are to be considered when determining if an encounter with the police rises to the level of a seizure of the person: "whether the officer makes a show of

---

6. Although Appellant's suppression arguments cite both the state and federal constitutions, Appellant fails to differentiate or distinguish in any way the protections granted by the United States Constitution, as compared to the protections granted by the Pennsylvania Constitution. We conclude, however, that neither constitution has been violated.

authority or exercises force, the officer's demeanor and manner of expression, the location, and the content of any interrogatories or statements." *Jermaine,* 582 A.2d at 1060. Examples of circumstances which might indicate a seizure of the person include "a threatening presence of several police officers; the display of a weapon by an officer; some physical touching of the person of the citizen; or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Jermaine,* 582 A.2d at 1061. In the absence of such evidence, contact between an officer and a citizen cannot, as a matter of law, amount to a seizure of that person. *Jermaine,* 582 A.2d at 1061.

¶ 13 In addition to the above circumstances, the courts of this state, as well as the courts of other states, have adopted the following objective standard for determining what amount of force escalates a mere encounter into an investigative detention:[7] whether, under all the circumstances surrounding the incident at issue, a reasonable person would believe he was free to leave. *Commonwealth v. Matos,* 543 Pa. 449, 457, 672 A.2d 769, 774 (1996) (citations omitted). This test was applied in cases involving police contact in airports and bus stations, but the United States Supreme Court in *Bostick, supra,* found that where police contact is initiated on a bus itself, the "free to leave" analysis is inapplicable, and the appropriate inquiry is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Bostick,* 501 U.S. at 436, 111 S.Ct. 2382. The mere fact that an encounter takes place on

a bus does not elevate it to the level of an investigative detention. *Bostick,* 501 U.S. at 435, 111 S.Ct. 2382. *But see Commonwealth v. Vasquez,* 703 A.2d 25 (Pa.Super.1997).

¶ 14 In the instant case, we conclude that the initial contact between Appellant and Officer Hodges was a mere encounter. Because the contact involved no police coercion, we find that Appellant voluntarily abandoned the bag containing the cocaine. Additionally, we conclude that Appellant voluntarily revealed her intentions to Trooper Hodges, and that after she told him she was delivering the drugs, she was properly *Mirandized.*

¶ 15 From the beginning, the drug interdiction effort which resulted in Appellant's arrest was an "encounter," not a "stop" for search and seizure purposes. The bus on which Appellant was a passenger was already at rest, on its own, at the time the police approached it, and their investigation was conducted with the permission of the bus driver, who voluntarily consented to the officer's request to board the bus.[8] Once on board, Trooper Hodges introduced himself and explained the reason for the officers' presence. He did so in a non-threatening way, and made no excessive displays of authority, which would intimidate the passengers or coerce compliance. Thus, Trooper Hodges' actions in this regard did not elevate the encounter to an investigatory stop.

¶ 16 When Trooper Hodges began his interaction with Appellant, he stood in the stairwell of the bus, leaving room for Appellant to exit the bus. He did not threat-

---

7. An investigative detention is also known as a *"Terry stop,"* after the United States Supreme Court decision of that name which permitted police officers to effect a precautionary seizure where the police have a reasonable suspicion that criminal activity is afoot. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

8. "There is no illegality in the request for the driver's cooperation – an officer may always ask, if lawfully in position to do so. Only if

the request is under coercive circumstances which preclude voluntary consent will the request be constitutionally invalid." *Commonwealth v. Wilmington,* 729 A.2d 1160, 1175 (Pa.Super.1999) (citing *Commonwealth v. Lopez,* 415 Pa.Super. 252, 609 A.2d 177 (1992)). We note that *Wilmington* is factually distinguishable from the case *sub judice* in both the circumstances of the entry onto the bus and the circumstances surrounding the questioning of the person subsequently arrested.

en Appellant, touch Appellant in any way, or even accuse her of any criminal activity. After Appellant produced her ticket receipt, Trooper Hodges did not retain it while conversing with Appellant, but instead handed it back to her. Trooper Hodges demeanor was polite and non-confrontational, and his weapon remained hidden by his jacket at all times. During the interaction between Trooper Hodges and Appellant, Agent Paret remained in a non-threatening position behind Appellant, where he would not block Appellant's exit. The law enforcement officers clearly acted in a professional manner, consistent with principles of constitutional law. Their conduct did not elevate this encounter to a "seizure." *Kim, supra.*

¶ 17 Additionally, we find that the location of the encounter, i.e. a bus, did not render the interaction here a "seizure." *Bostick, supra. Kim,* 27 F.3d at 951–952 (finding unpersuasive the argument that a seizure occurred because the police contact took place in the confined area of a train car "roomette," concluding that "an individual may decline an officer's request without fearing prosecution, because a refusal to cooperate, without more, does not furnish the minimal level of objective justification deeded for a detention or seizure," and further, that "the location in itself does not deprive an individual of his ability to terminate an encounter; he can reject an invitation to talk in a private, as well as a public place"). We conclude that under all the circumstance surrounding this encounter, the conduct of Trooper Hodges and Agent Paret would not have communicated to a reasonable person that the person was not free to decline Trooper Hodges' requests, or otherwise terminate the encounter. *Bostick, supra* ; Moreover, we find that the interaction between Appellant, Trooper Hodges, and Agent Paret did not rise above the level of a mere encounter, and that Appellant was not "seized" for the purposes of the Fourth Amendment or Article 1, Section 8.

 ¶ 18 Because Appellant's contact with Trooper Hodges and Agent Paret was a mere encounter, we find that she voluntarily abandoned the bag containing the cocaine. "It is axiomatic that a defendant has no standing to contest the search and seizure of items which he has voluntarily abandoned." *Commonwealth v. Tillman,* 423 Pa.Super. 343, 621 A.2d 148, 150 (1993) (citation omitted). *Commonwealth v. Shoatz,* 469 Pa. 545, 553, 366 A.2d 1216, 1220 (1976) ("[I]t is well settled that no one has standing to complain of a search or seizure of property that he has voluntarily abandoned."). However, this Commonwealth has adopted a theory of abandonment only when it is shown that the seized evidence was not discarded because of unlawful police coercion. *Shoatz,* 469 Pa. at 553, 366 A.2d at 1220. As the Pennsylvania Supreme Court explained in *Shoatz* :

> The theory of abandonment is predicated upon the clear intent of an individual to relinquish control of property he possesses.
>
> Abandonment is primarily a question of intent, and intent may be inferred from words spoken, acts done, and other objective facts. All relevant circumstances existing at the time of the alleged abandonment should be considered. Police pursuit or the existence of a police investigation does not of itself render abandonment involuntary. The issue is not abandonment in the strict property-right sense, but whether the person prejudiced by the search had voluntarily discarded, left behind, or otherwise relinquished his interest in the property in question so that he could no longer retain a reasonable expectation of privacy with regard to it at the time of the search.

*Shoatz,* 469 Pa. at 553, 366 A.2d at 1220. (citations omitted).

 ¶ 19 If a person is not subject to a seizure when an abandonment occurs, the action of abandonment is not the result of unlawful police coercion, and the abandoned item may be admitted as evidence.

*Commonwealth v. Riley*, 715 A.2d 1131, 1134 (Pa.Super.1998).

¶ 20 In the case *sub judice*, a review of all relevant circumstances existing at the time of the alleged abandonment shows that Appellant intended to abandon the bag in which the cocaine was found, as can be inferred from Appellant's actions, or, more precisely, inaction. When initially asked by Trooper Hodges if she had luggage, Appellant denied having any luggage. Moreover, she continued to claim she had no luggage when Trooper Hodges inquired about the bag laying directly at her feet, and then remained silent while Trooper Hodges held the bag up for the passengers to see, in an effort to identify its owner. Appellant's failure to claim the bag under such circumstances clearly amounts to abandonment. Further, the encounter between Appellant and the officers did not amount to unlawful police coercion and did not render the abandonment involuntary. *Shoatz*, 469 Pa. at 553, 366 A.2d at 1220.

¶ 21 In light of our determination that Appellant voluntarily abandoned the bag, it is clear that the suppression court's denial of Appellant' motion with regard to abandonment was supported by the record and did not involve erroneous legal conclusions, and, therefore, we are bound by the suppression court's ruling in this regard.

 ¶ 22 Turning to Appellant's arguments regarding the statements she made to Trooper Hodges prior to her *Miranda* rights being given, we find that Appellant was not in custody when the statements were made, and, therefore, the statements were correctly allowed as evidence by the suppression court.

Before an individual is subjected to custodial interrogation, he must make a knowing and intelligent waiver of his privilege against self-incrimination and right to counsel after adequate warning as to those rights. *Commonwealth v. Medley*, 531 Pa. 279, 284–286, 612 A.2d 430, 433 (1992) (citing *Miranda, supra* ). Whether a person is in custody for Miranda purposes depends on whether the person is physically denied his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action is restricted by the interrogation. *Commonwealth v. Ellis*, 700 A.2d 948 (1997); *Commonwealth v. Zogby*, 455 Pa.Super. 621, 689 A.2d 280, 282 (1997).

*Commonwealth v. Prosek*, 700 A.2d 1305, 1308 (Pa.Super.1997).

 ¶ 23 "In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.' " *Commonwealth v. Busch*, 713 A.2d 97, 99 (Pa.Super.1998) (citing *Stansbury v. California*, 511 U.S. 318, 322–323, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994) (*per curiam* ) (other citations omitted)). The initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views of the law enforcement officer or the person being questioned. *Busch, supra, Prosek, supra.* "The fact that a defendant was the focus of the investigation is … a relevant factor in determining whether he was 'in custody,' but does not require, per se, Miranda warnings." *Commonwealth v. Peters*, 434 Pa.Super. 268, 642 A.2d 1126, 1130 (1994).

¶ 24 In the case *sub judice*, the objective circumstances surrounding Appellant's statements were not such that Appellant was physically denied her freedom of action; nor was she placed in a situation in which a reasonable person would believe that her freedom of action was restricted. The conversation between Appellant and Trooper Hodges while on board the bus involved no coercion, show of force or any other form of intimidating behavior on Trooper Hodges' part. Appellant, the last of thirty-five (35) to forty (40) people approached, was free to leave at any point during the course of the investigation, and free to decline to answer Trooper Hodges'

questions. Further, Appellant voluntarily agreed to speak to Trooper Hodges outside of the bus. Once off the bus, there were no other police officers involved in the conversation; Trooper Hodges did not display his weapon; he did not physically touch Appellant in any way; and he did not use language or a tone of voice which would indicate that compliance was compelled. Nothing during their interaction prevented Appellant from refusing Trooper Hodges' request to speak with him in private, or, once off the bus, from terminating the encounter and returning to her seat.

■■■ ¶ 25 We find no merit to the argument that Trooper Hodges' conversation with Appellant, while in the bus or out, amounted to a custodial interrogation. Clearly, there was no "formal arrest," and the circumstances of the encounter did not result in a restraint on Appellant's freedom of movement to the degree associated with a formal arrest. We conclude that the suppression court correctly permitted Appellant's statements to be admitted at trial.

¶ 26 Appellant also raises allegations with regard to mandatory sentencing, asserting that it was error for the lower court to sentence her pursuant to 18 Pa. C.S.A. § 7508, because that section violates Article 1, Section 13 [9] and Article 5, Section 5 [10] of the Pennsylvania Constitution. Appellant cites no controlling case law to support her assertions.

■■■ ¶ 27 The Pennsylvania Supreme Court has consistently held that enactments of the General Assembly enjoy a strong presumption of constitutionality. *Commonwealth v. Barud*, 545 Pa. 297, 304, 681 A.2d 162, 165 (1996) (citing *Commonwealth v. Mikulan*, 504 Pa. 244, 247, 470 A.2d 1339, 1340 (1983)). All doubts are to

be resolved in favor of sustaining the constitutionality of the legislation. *Commonwealth v. Blystone*, 519 Pa. 450, 463, 549 A.2d 81, 87 (1988), *affirmed*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990) (citing *Hayes v. Erie Ins. Exchange*, 493 Pa. 150, 155, 425 A.2d 419, 421 (1981)). "[N]othing but a clear violation of the Constitution – a clear usurpation of power prohibited – will justify the judicial department in pronouncing an act of the legislative department unconstitutional and void." *Glancey v. Casey*, 447 Pa. 77, 88, 288 A.2d 812, 818 (1972) (citing *Busser v. Snyder*, 282 Pa. 440, 449, 128 A. 80 (1925)). In other words, "we are obliged to exercise every reasonable attempt to vindicate the constitutionality of a statute and uphold its provisions." *Commonwealth v. Chilcote*, 396 Pa.Super. 106, 578 A.2d 429, 435 (1990) (citing *Commonwealth v. Trill*, 374 Pa.Super. 549, 543 A.2d 1106, 1116 (1988)). "The right of the judiciary to declare a statute void, and to arrest its execution, is one which, in the opinion of all courts, is coupled with responsibilities so grave that it is never to be exercised except in very clear cases." *Erie & North–East Railroad Co. v. Casey*, 26 Pa. 287, 300 (1856). Moreover, one of the most firmly established principles of our law is that the challenging party has a heavy burden of proving an act unconstitutional. *Barud*, 545 Pa. at 304, 681 A.2d at 165. In order for an act to be declared unconstitutional, the challenging party must prove the act "clearly, palpably and plainly" violates the constitution. *Barud*, 545 Pa. at 304, 681 A.2d at 165. *See Blystone, supra*. Finally, we note that:

> The power of judicial review must not be used as a means by which the courts might substitute its judgment as to public policy for that of the legislature. The

---

**9.** Article 1, Section 13. Bail, fines and punishments

Excessive bail shall not be required, nor excessive fines imposed, nor cruel punishment inflicted.

**10.** Article 5, Section 5. Courts of common pleas

There shall be one court of common pleas for each judicial district (a) having such divisions and consisting of such number of judges as shall be provided by law, one of whom shall be the president judge; and (b) having unlimited original jurisdiction in all cases except as may otherwise be provided by law.

role of the judiciary is not to question the wisdom of the action of [the] legislative body, but only to see that it passes constitutional muster.

*Finucane v. Pennsylvania Marketing Bd.*, 136 Pa.Cmwlth. 272, 582 A.2d 1152, 1154 (1990) (citations omitted).

 ¶ 28 Appellant's policy arguments against mandatory sentencing are not shared by either the legislature or the courts of this Commonwealth. As the Pennsylvania Supreme Court has held, mandatory sentencing provisions do not violate a person's Constitutional rights. *See Commonwealth v. Bell*, 512 Pa. 334, 342, 516 A.2d 1172, 1176 (1986). We conclude that Appellant has not proven that Section 7508 clearly, palpably and plainly violates either Article 1, Section 13, or Article 5, Section 5, and, therefore, her claim is without merit

¶ 29 For the above reasons, we find that Appellant's suppression motion was properly denied, and that the sentence which Appellant received is constitutional.

¶ 30 Affirmed.

¶ 31 McEWEN, President Judge, dissents.